IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DONALD COLE, | : | |
| | : | |
| Petitioner, | : | |
| | : | |
| v. | : | Civil Action No. 08-328-CFC |
| | : | |
| DANA METZGER, Warden, and | : | |
| ATTORNEY GENERAL OF THE | : | |
| STATE OF DELAWARE, | : | |
| | : | |
| Respondents. | : | |

---

Donald Cole. *Pro se* Petitioner.

Maria T. Knoll, Deputy Attorney General of the Delaware Department of Justice, Wilmington, Delaware. Attorney for Respondents.

---

### MEMORANDUM OPINION[1]

October 17, 2019
Wilmington, Delaware

---

[1]This case was originally assigned to the Honorable Gregory M. Sleet, and was re-assigned to the undersigned's docket on September 20, 2018.

CONNOLLY, UNITED STATES DISTRICT JUDGE:

Pending before the Court is Petitioner Donald Cole's Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 and his Amended Petition ( "Petition"). (D.I. 2; D.I. 41)  The State filed an Answer and an Amended Answer.  (D.I. 13; D.I. 44)  For the reasons discussed, the Court will deny the Petition.

## I.     BACKGROUND

### A.  Factual Background For Lancaster Avenue and East 23rd Street Convictions

As set forth by the Delaware Supreme Court in Petitioner's second post-conviction appeal, the facts leading to Petitioner's arrests and convictions are as follows:

> [Petitioner] and Larry Johnson were charged with shooting and injuring two residents while burglarizing a home on Lancaster Avenue in Wilmington [on August 22, 2001]. […] [Petitioner], Johnson, and Travanian Norton were [also] accused of shooting and killing two residents while burglarizing a home on 23rd Street in Wilmington [on August 31, 2001]. The same guns were used in both burglaries.
>
> The State charged [Petitioner] for the Lancaster Avenue burglary along with Elwood Hunter. [Petitioner] knew Hunter was not involved in the burglary and wanted to give a statement to exonerate him. [Petitioner's] counsel advised him not to and warned that if he did so, the State would likely charge him for the 23rd Street murders and seek the death penalty. [Petitioner] nonetheless insisted on giving the statement, and the parties negotiated a plea agreement. The parties disagree, however, on exactly what the State promised [Petitioner] in exchange for the statement.
>
> According to the State, they agreed that if [Petitioner] pleaded guilty and gave a statement providing information about both the Lancaster Avenue and 23rd Street burglaries, they would "consider" waiving the death penalty for the 23rd Street charges. They would not waive the death penalty,

however, "until they knew the content and substance of [Petitioner's] statement." According to [Petitioner], he "believed that, in exchange for [his] truthful statement, the State would not seek the death penalty." In addition, [Petitioner] believed the statement would be used only for "review and consideration of the death penalty," and not "for any other purpose." The agreement was not reduced to writing.

On January 14, 2003, [Petitioner] gave the statement. At the beginning of the recording, the attorney for the State specified, "we are going to take [a] proper statement of what you have to say about anything we ask you about and I'm going to take that statement back to my superiors and discuss with them whether to make you an offer where you would be spared capital punishment." The State said nothing about using the statement for any other purpose. In his statement, [Petitioner] exonerated Hunter and admitted his involvement in both the Lancaster Avenue and the 23rd Street burglaries. He stated that Norton was an accomplice in the 23rd Street burglary and that Johnson was an accomplice in both. [Petitioner] then pleaded guilty to the charges of attempted first degree murder, first degree assault, and two counts of possession of a firearm by a person prohibited for the Lancaster Avenue burglary and shooting. [The Superior Court sentenced Petitioner to 18 years at Level 5 suspended after 15 years for probation for the attempted first degree murder conviction, to a total of 3 years at Level 5 for the 3 PFDCF convictions, and to 1 year at Level 5 for the first degree assault conviction. Petitioner did not appeal.]

Following the Lancaster Avenue plea, the State charged [Petitioner] with the 23rd Street murders and sought the death penalty. [Petitioner] filed a motion to prevent the State from seeking the death penalty, arguing it had agreed to waive it in exchange for his statement. The court denied [Petitioner]'s motion, finding "[t]he transcript contain[ed] no promises about benefit to [Petitioner] as a result of the proffer, other than [the State's] willingness to consider the information and review [Petitioner's] request again with the senior staff."

The State also questioned Norton about his involvement in the 23rd Street burglary and played him a part of [Petitioner's] recorded statement. After hearing that [Petitioner] implicated him, Norton agreed to give a statement and testify against [Petitioner] in exchange for a favorable plea deal. [Petitioner] filed a motion to suppress all evidence derived from his statement, including Norton's statement and testimony, arguing that the State did not reveal it was going to use the statement for any purpose other than possible waiver of the death penalty. The court denied that motion as well, finding the State had only agreed not to use the audiotape at trial. The court allowed Norton to testify.

Also prior to trial, an inmate, Gary Lloyd, came forward and said his cellmate confessed to committing the burglary. [Petitioner's] counsel did not investigate Lloyd or his cellmate. According to [Petitioner], his counsel only communicated with him five times outside of court proceedings. At trial, Norton was the only witness to implicate [Petitioner]. In his statement, Norton said that he saw [Petitioner] climb into a window from the roof, but was not sure how [Petitioner] got onto the roof. At trial, however, Norton testified that he saw [Petitioner] climb onto an open trash can and saw Johnson push [Petitioner] up onto the roof. Norton also testified that once inside, he saw [Petitioner] shoot one victim, and saw [Petitioner] and Johnson both shoot the other. The defense attorney never visited the crime scene, but did cross-examine a state witness about the area, including the lighting and the characteristics of the roof. On July 31, 2004, the jury convicted [Petitioner] of four counts of first degree murder, first degree burglary, second degree conspiracy, and five counts of possession of a firearm by a person prohibited. The jury did not impose the death penalty, and the court sentenced [Petitioner] to life in prison.

[Petitioner] appealed the 23rd Street conviction, arguing the court erred in denying his motion to suppress the statement and evidence derived from it. On October 20, 2005, [the Delaware Supreme Court] remanded the case but retained jurisdiction, requiring the Superior Court to make explicit factual findings regarding the proffer. The [Superior Court] made the factual findings on March 14, 2006, and [the Delaware Supreme Court] affirmed [Petitioner's] convictions

on March 12, 2007. On July 17, 2007, [Petitioner] filed a *pro se* motion for postconviction relief, alleging ineffective counsel and insufficient evidence, which the Superior Court denied on December 7, 2007. [The Delaware Supreme Court] affirmed on April 30, 2008. Next, [Petitioner] filed a petition for a writ of habeas corpus in federal court, which was stayed at [Petitioner]'s request so he could file an amended motion for postconviction relief in the Delaware Superior Court. He filed the motion on October 22, 2010, alleging sixteen counts of ineffective counsel. On September 21, 2012, the Superior Court Commissioner denied [Petitioner]'s amended motion, which [Petitioner] appealed. On August 1, 2017, the Superior Court affirmed the Commissioner's denial after holding three days of evidentiary hearings and allowing [Petitioner] to appoint an investigator and ballistics expert.

*Cole v. State*, 181 A.3d 614 (Table), 2018 WL 1129109, at *1-*2 (Del. Feb. 28, 2018).

The Delaware Supreme Court affirmed the Superior Court's decision on February 28, 2018. *Id.* at *6.

### B. Procedural Background in § 2254 Proceeding

On May 30, 2008, Petitioner filed a Petition for a Writ of Habeas Corpus in this Court. (D.I. 2) After the State filed its Answer on October 8, 2008, Petitioner filed a Motion to Stay the proceeding. (D.I. 13; D.I. 16; D.I. 19) On April 7, 2009, the Honorable Gregory M. Sleet granted Petitioner's unopposed Motion to Stay the proceedings to allow Petitioner to exhaust state remedies. (D.I. 24) On August 1, 2018, the State informed the Court that Petitioner's Rule 61 proceedings were completed. The Court lifted the stay on September 25, 2018. (D.I. 35) Petitioner filed an amended Petition on February 19, 2019, and the State filed its amended Answer on April 4, 2019. (D.I. 41; D.I. 44) Petitioner filed a Reply to the Answer on May 29, 2019. (D.I. 50) The Petition is ready for review.

4

## II.  GOVERNING LEGAL PRINCIPLES

### A. The Antiterrorism and Effective Death Penalty Act of 1996

Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA") "to reduce delays in the execution of state and federal criminal sentences . .

. and to further the principles of comity, finality, and federalism." *Woodford v. Garceau*,

538 U.S. 202, 206 (2003).  Pursuant to AEDPA, a federal court may consider a habeas

petition filed by a state prisoner only "on the ground that he is in custody in violation of

the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  Claims

based on errors of state law are not cognizable on federal habeas review, and federal

courts cannot re-examine state court determinations of state law issues.  *See Mullaney*

*v. Wilbur*, 421 U.S. 684, 691 (1975) ("[s]tate courts are the ultimate expositors of state

law"); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (holding that claims based on

errors of state law are not cognizable on habeas review).  Additionally, AEDPA imposes

procedural requirements and standards for analyzing the merits of a habeas petition in

order to "prevent federal habeas 'retrials' and to ensure that state-court convictions are

given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

### B. Exhaustion and Procedural Default

Absent exceptional circumstances, a federal court cannot grant habeas relief

unless the  petitioner has exhausted all means of available relief under state law.  *See*

28 U.S.C. § 2254(b); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842-44 (1999); *Picard v.*

*Connor*, 404 U.S. 270, 275 (1971).  AEDPA states, in pertinent part:

> An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court
> shall not be granted unless it appears that –

(A) the applicant has exhausted the remedies available in the courts of the State; or

(B)(i) there is an absence of available State corrective process; or
   (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).

The exhaustion requirement is based on principles of comity, requiring a petitioner to give "state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan*, 526 U.S. at 844-45; *see Werts v. Vaughn*, 228 F.3d 178, 192 (3d Cir. 2000). A [Petitioner] satisfies the exhaustion requirement by demonstrating that the habeas claims were "fairly presented" to the state's highest court, either on direct appeal or in a post-conviction proceeding, in a procedural manner permitting the court to consider the claims on their merits. *See Bell v. Cone*, 543 U.S. 447, 451 n.3 (2005); *Castille v. Peoples,* 489 U.S. 346, 351 (1989). A federal legal claim is "fairly presented" to state courts when there is: (1) reliance in the state courts on pertinent federal cases employing constitutional analysis; (2) reliance on state cases employing constitutional analysis in like fact situations; (3) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution; and (4) allegation of a pattern of facts that is well within the mainstream of constitutional litigation. *See McCandless v. Vaughn*, 172 F.3d 255, 261 (3d Cir. 1999). If the petitioner raised the issue on direct appeal in the correct procedural manner, the claim is exhausted and the petitioner does

not need to raise the same issue again in a state post-conviction proceeding. *See Lambert v. Blackwell,* 134 F.3d 506, 513 (3d Cir. 1996).

If a petitioner presents unexhausted habeas claims to a federal court, and further state court review of those claims is barred due to state procedural rules, the federal court will excuse the failure to exhaust and treat the claims as exhausted. *See Coleman v. Thompson,* 501 U.S. 722, 732, 750-51 (1991) (such claims "meet[] the technical requirements for exhaustion" because state remedies are no longer available); *see also Woodford v. Ngo,* 548 U.S. 81, 92-93 (2006). Such claims, however, are procedurally defaulted. *See Coleman,* 501 U.S. at 749; *Lines v. Larkins,* 208 F.3d 153, 160 (3d Cir. 2000). Similarly, if a petitioner presents a habeas claim to the state's highest court, but that court "clearly and expressly" refuses to review the merits of the claim due to an independent and adequate state procedural rule, the claim is exhausted but procedurally defaulted. *See Coleman,* 501 U.S. at 750; *Harris v. Reed,* 489 U.S. 255, 260-64 (1989).

Federal courts may not consider the merits of procedurally defaulted claims unless the petitioner demonstrates either cause for the procedural default and actual prejudice resulting therefrom, or that a fundamental miscarriage of justice will result if the court does not review the claims. *See McCandless,* 172 F.3d at 260; *Coleman,* 501 U.S. at 750-51. To demonstrate cause for a procedural default, a [Petitioner] must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier,* 477 U.S. 478, 488 (1986). To demonstrate actual prejudice, a petitioner must show that the errors during his trial

7

created more than a possibility of prejudice; he must show that the errors worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 494.

Alternatively, if a petitioner demonstrates that a "constitutional violation has probably resulted in the conviction of one who is actually innocent,"[2] then a federal court can excuse the procedural default and review the claim in order to prevent a fundamental miscarriage of justice. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Wenger v. Frank*, 266 F.3d 218, 224 (3d Cir. 2001). The miscarriage of justice exception applies only in extraordinary cases, and actual innocence means factual innocence, not legal insufficiency. *See Bousley v. United States*, 523 U.S. 614, 623 (1998); *Murray*, 477 U.S. at 496. A petitioner establishes actual innocence by asserting "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial," showing that no reasonable juror would have voted to find the [Petitioner] guilty beyond a reasonable doubt. *Hubbard v. Pinchak*, 378 F.3d 333, 339-40 (3d Cir. 2004).

### C. Standard of Review

If a state's highest court adjudicated a federal habeas claim on the merits, the federal court must review the claim under the deferential standard contained in 28 U.S.C. § 2254(d). Pursuant to 28 U.S.C. § 2254(d), federal habeas relief may only be granted if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," or the state court's decision was an unreasonable determination of

---

[2]*Murray*, 477 U.S. at 496.

the facts based on the evidence adduced in the trial. 28 U.S.C. § 2254(d)(1) & (2); *see also Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001). A claim has been "adjudicated on the merits" for the purposes of 28 U.S.C. § 2254(d) if the state court decision finally resolves the claim on the basis of its substance, rather than on a procedural or some other ground. *See Thomas v. Horn*, 570 F.3d 105, 115 (3d Cir. 2009). The deferential standard of § 2254(d) applies even "when a state court's order is unaccompanied by an opinion explaining the reasons relief has been denied." *Harrington v. Richter*, 562 U.S. 86, 98 (2011). As explained by the Supreme Court, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id.* at 99.

Finally, when reviewing a habeas claim, a federal court must presume that the state court's determinations of factual issues are correct. *See* 28 U.S.C. § 2254(e)(1). This presumption of correctness applies to both explicit and implicit findings of fact, and is only rebutted by clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1); *Campbell v. Vaughn*, 209 F.3d 280, 286 (3d Cir. 2000); *Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003) (stating that the clear and convincing standard in § 2254(e)(1) applies to factual issues, whereas the unreasonable application standard of § 2254(d)(2) applies to factual decisions).

## III.   DISCUSSION

The instant Petition asserts the following seven grounds for relief related to Petitioner's convictions for the 23rd Street murders: (1) the Delaware Superior Court

9

erred by not suppressing all evidence obtained through the use of the pre-trial proffer Petitioner gave to prosecutors before he entered a guilty plea in his Lancaster Avenue trial; (2) Petitioner's rights under the Confrontation Clause were violated when the State presented the prior out-of-court statement of a witness (Bessie Warner) who was unable to recall her statement given to police; (3) the trial court erred by allowing a window screen that had not been properly authenticated into evidence; (4) defense counsel provided ineffective assistance by failing to argue that the murders were not in furtherance of a burglary; (5) the trial court provided erroneous felony murder jury instructions in the 23rd Street trial; (6) the trial judge was biased because the one of the prosecutors had been the judge's law clerk many years prior to the trial; (7) defense counsel provided ineffective assistance by failing to communicate with Petitioner, failing to interview other suspects, and failing to visit the crime scene; and (8) cumulative error.

## A. Claim One: Denial of Suppression Motion

In Claim One, Petitioner contends that the trial court erred by refusing to suppress all evidence "gained through the use of" the audiotaped statement he gave to the State prior to his trial in the Lancaster Avenue attempted murder case which exonerated wrongfully accused Hunter but implicated Norton in the 23rd Street murders. According to Petitioner, prior to making a full statement regarding both the Lancaster Ave and 23rd Street incidents, he and the State entered into an oral agreement whereby Petitioner agreed to plead guilty to the Lancaster Avenue attempted murder charges in exchange for the State not seeking the death penalty for Petitioner in the 23rd Street murder trial. Petitioner contends that the State breached the agreement by confronting

10

Norton with Petitioner's statement, which resulted in Norton making a deal with the State and giving a statement that implicated Petitioner in the 23rd Street murders. Prior to his trial on the 23rd Street murders, Petitioner filed a motion to suppress all evidence derived from his statement, including Norton's statement and testimony, arguing that the State did not reveal it was going to use Petitioner's statement for any purpose other than considering whether to waive the death penalty. (D.I. 45-14 at 39-43 ) After conducting an office conference (D.I. 45-14 at 43-50), the trial court denied the motion to suppress, finding that State had only agreed not to use the audiotape at trial (which was already prohibited by Delaware Rule of Evidence 410). (D.I. 45-14 at 38, 49) Norton testified for the State during the 23rd Street murder trial in return for leniency. "The police possessed no other evidence linking Norton to the crime ... [and] Norton was the only witness who unequivocally identified Petitioner as the perpetrator in the 23rd Street murders at trial." *Cole v. State*, 922 A.2d 354, 379 (Del. 2005). Petitioner presented the argument concerning the Superior Court's allegedly erroneous denial of the suppression motion to the Delaware Supreme Court on direct appeal of his convictions in the 23rd Street murders, arguing that the trial court should have suppressed Norton's testimony and all other evidence derived from the use of Petitioner's audiotaped statement. The Delaware Supreme Court remanded the case to the Superior Court to address questions related to the admissibility of the evidence derived from the State's use of Petitioner's proffer. After the Superior Court answered the remand questions, the Delaware Supreme Court held that the Superior Court did not

11

err in denying the suppression motion and admitting the evidence derived from Petitioner's audiotaped statement.

The State contends that Claim One fails to assert an issue cognizable on federal habeas review, because the Delaware state courts analyzed the parameters of the oral agreement/proffer under "the auspices of state contract law, rather than federal constitutional law." (D.I. 44 at 17) What the State ignores, however, is that Petitioner challenges the Delaware state courts' factual determination regarding the parameters of the oral agreement/proffer, which is an issue properly analyzed under § 2254(d)(2). In other words, since Petitioner challenges the factual basis for the Delaware Supreme Court's affirmance of the Superior Court's denial of his suppression motion, Claim One will warrant relief if the Delaware Supreme Court's decision was based on an unreasonable determination of facts in light of the evidence presented in the State court proceeding.

The fundamental question the Court must answer in determining if Claim One warrants relief is whether the record supports Petitioner's version of the agreement or the Delaware Supreme Court's conclusion about the terms the agreement. The Court starts with the Delaware Supreme Court's extensive and thorough factual summary as set forth below:

> Before the trial for the conduct that occurred at 1348 Lancaster Avenue, the Deputy Attorney General assigned to prosecute the case filed a motion in limine, seeking to admit evidence about a double homicide that had occurred on August 31, 2001, at 105 East 23rd Street in Wilmington. No one had been charged with the murders at that time, but the motion proffered that ballistics evidence would show that the firearms used in the attempted murder at 1348 Lancaster

12

Avenue were the same as those used in the murders at 105 East 23rd Street. The motion in limine also proffered that the State would produce a witness who would testify to having seen both [Petitioner] and Hunter near the alley behind 105 East 23rd Street, armed with handguns on the night of August 31, 2001. The trial judge denied the State's motion.

During the "1348 Lancaster Avenue" trial, the State did not produce any witness who identified [Petitioner]. The State, however, did produce an eyewitness who identified Hunter as one of the assailants in the attempted murder. That witness testified that she was so sure of her identification, that her level of certainty was an eleven on a zero to ten scale.

[Petitioner] however, knew that the witness had mistakenly identified Hunter. In an effort to exonerate Hunter, [Petitioner] informed his trial attorney, Brian Bartley, that he would plead guilty to the charges in the 1348 Lancaster Avenue case if the State would drop its prosecution of Hunter. Bartley advised [Petitioner] not to plead guilty and told him that the State's case against him was weak. Bartley also advised [Petitioner] that, if he pled guilty to the charges in the 1348 Lancaster Avenue case, the State, based on the ballistics evidence proffered in the motion in limine, likely would charge [Petitioner] with the 105 East 23rd Street murders and seek the death penalty.

Despite Bartley's advice, [Petitioner] was determined to exonerate Hunter. On January 13, 2003, during a break in the trial, Bartley told the DAG that [Petitioner] wanted to give a statement exonerating Hunter. Bartley sought to strike a deal with the DAG in which the State would not seek the death penalty in the 105 East 23rd Street murders. In exchange for not seeking the death penalty, [Petitioner] would plead guilty to the 1348 Lancaster Avenue charges, and would give a full statement regarding both the 1348 Lancaster Avenue and the 105 East 23rd Street incidents. The DAG told Bartley that he was interested in this deal, but he would have to take [Petitioner's] offer to "the senior staff" in the Attorney General's office before he could confirm the deal.

The senior staff met on the morning of January 14, 2003, to discuss [Petitioner's] offer. The trial judge, however, refused to delay the ongoing trial, so the trial continued with the State and the defense resting by midday on January 14. After a lunch break, the DAG and Bartley resumed their negotiations. They decided that [Petitioner] would confess to the attempted murder at 1348 Lancaster Avenue, and provide a statement regarding the 1348 Lancaster Avenue and 105 East 23rd Street crimes. Also, the DAG informed Bartley that the senior staff would not consider waiving the death penalty for [Petitioner] with regard to the 105 East 23rd Street murders until they knew the content and substance of [Petitioner's] statement. The DAG and Bartley, however, did not put any agreement in writing and have since disagreed about the terms of any such agreement.

Both Bartley and [Petitioner] believed that, in exchange for Petitioner's truthful statement, the State would not seek the death penalty for the 105 East 23rd Street murders. Bartley also believed that the DAG's comments before and after [Petitioner's] statement confirmed that the State would limit the use of [Petitioner's] statement to the senior staff's review and consideration of the death penalty. In other words, Bartley believed that the trial DAG had represented that he would present [Petitioner's] statement to the senior staff so they could assess its truthfulness and that the State would not use [Petitioner's] statement for any other purpose.

On the afternoon of January 14, 2003, [Petitioner], pursuant to what he now asserts was his understanding of the agreement, gave an audiotaped statement regarding the two cases. At the beginning of [Petitioner's] statement, the DAG told [Petitioner] that:

> the deal right now is that we are going to take uh a [proffer] statement of what you have to say about anything we ask you about and I'm going to take that statement back to my superiors and discuss with them whether to make you an offer where you would be spared capital punishment. Do you understand that?

The DAG proffered no other use of the statement before [Petitioner] began to speak.

[Petitioner] responded that he understood. [Petitioner] then admitted his involvement in the 1348 Lancaster Avenue attempted murder, provided a detailed statement of the incident, including how he gained entry into the residence, and identified his accomplice. [Petitioner] also gave a detailed statement concerning the 105 East 23rd Street murders and implicated Travanian Norton and Larry Johnson as his accomplices. At that time, the State had no evidence linking Norton to the 105 East 23rd Street murders. At the end of the interrogation, the following exchange occurred between the DAG and Petitioner:

> [DAG]: We'll we'll [sic] terminate this and uh I'm gonna go back to my office and do what I told you I was gonna do [at] the beginning of this interview. Okay and uh obviously this conversation is not over we'll pick it up. Plus you don't want us to discuss the substance of this outside this room. Yeah we're not gonna talk about this with Sticky or Larry Johnson or anybody else. I I [sic] understand what you're saying, but listen why this is still ongoing there's a reason why we we [sic] want that. We know what you're saying to us and we we're [sic] gonna hold up our end. But listen we can't have anybody [know] it the less people know the less it's gonna leak out there. (emphasis supplied)

> [Petitioner]: I think Sticky already knows.

> [DAG]: Why do you know that?

> [Petitioner]: Cause we talked.

> [DAG]: Alright well let's not from now on don't talk about it.

That same afternoon, [Petitioner] pleaded guilty to the 1348 Lancaster Avenue attempted murder. [Petitioner's] statement exonerated Hunter of the Lancaster Avenue crimes and the State never charged Hunter with the 105 East 23rd Street murders.

15

The police later took Norton into custody for other reasons. While Norton was in custody the police played a portion of [Petitioner's] statement to him. After listening to [Petitioner's] statement and realizing that [Petitioner] had implicated him in the 105 East 23rd Street murders, Norton made a deal with the State, gave a statement implicating [Petitioner] in the murders, and agreed to testify against [Petitioner] in return for leniency. Norton was the only witness who identified [Petitioner] as a perpetrator in the 105 East 23rd Street murders; other eye-witnesses to the crime either could not positively identify [Petitioner] or said that [Petitioner] was not involved.

The State ultimately decided to indict [Petitioner] for the 105 East 23rd Street murders and seek the death penalty. Before trial, [Petitioner], in an effort to enforce his agreement with the State, filed a motion to prevent the State from seeking the death penalty. [Petitioner] argued that the State should be precluded from seeking the death penalty because he gave a true and complete incriminatory statement to law enforcement authorities. The trial judge held an evidentiary hearing and denied [Petitioner's] motion. She found that:

> [t]he transcript contains no promises about benefit to Petitioner as a result of the proffer, other than [the trial DAG's] willingness to consider the information and review [Petitioner's] request again with the senior staff. Notwithstanding [Petitioner's] assertions otherwise, it appears that it was not until after the proffer that a misunderstanding developed.

[Petitioner] then filed a pretrial motion to suppress his January 14, 2003 audiotaped statement, and any and all evidence derived from that statement, from use at trial. The trial judge, in a July 2, 2004 oral ruling in chambers, denied [Petitioner's] motion to suppress. She stated that:

> I reviewed the statement that was taken by the State. The statement was taken with counsel present, it was taken against advice of counsel, and it was taken voluntarily because [Petitioner] wanted to give it.

And the motion to suppress. The State restricted itself to the sole purpose of deciding whether to proceed non-capitol [sic]. In fact, as I review this, the only thing that the State committed itself to—it didn't say what it would do, it said it wouldn't use the statement at trial. In other words, it would comply with the requirements of [Delaware Rule of Evidence] 404.

The only restriction the State imposed on itself was the restriction that the Rules of Evidence imposed on the State and that is, not to use the defendant's statement unless the defendant testified inconsistent with that at trial, which is what [Delaware Rule of Evidence] 410 says.

So at this point, there being no further record presented to me, and the defendants having ample opportunity to explore this I'm going to deny the motion to suppress.

Eventually, a jury convicted [Petitioner] after a joint trial with his codefendant, Larry Johnson. Although the State sought the death penalty, [Petitioner] did not receive the death penalty. The State did not play [Petitioner's] January 14, 2003 statement at trial. However, Norton did testify as the State's primary witness.

On September 14, 2005, [Petitioner] appealed his conviction to this Court, arguing that the trial judge erred by denying his motion to suppress his statement and evidence derived from that statement, including Norton's testimony. At that time, we were unable to reach a conclusion and remanded the case to the trial judge, but retained jurisdiction so that she could make her factual findings with respect to [Petitioner's] motion to suppress more explicit. In so doing, we asked the trial judge to consider several specific questions.

In her decision on remand, the trial judge carefully answered each of our four questions. She found, *inter alia*, that before the proffer, [Petitioner] and the trial DAG agreed that [Petitioner's] statement would be used in two ways: (1) "to

determine whether the State would dismiss the charges against Hunter" and (2) "to evaluate the propriety of waiving the death penalty in connection with the prosecution of the 23rd Street double murders." The trial judge also addressed the trial DAG's statement at the end of [Petitioner's] interrogation that "we're not gonna talk about this with Sticky or Larry Johnson or anybody else." She found that "the agreement before and after the proffer was that the only limitation on the use of the statement was D.R.E. 410," and that "[t]he State did not breach the deal with [Petitioner]." Finally, in assessing whether [Petitioner] detrimentally relied on any promise by the State to use his statement only for a limited purpose, the trial judge concluded that "[Petitioner] gave his statement because he felt a 'moral imperative' not to let Hunter be convicted of Lancaster Avenue, or charged with 23rd Street."

*Cole*, 922 A.2d at 366–70.

After providing the foregoing background, the Delaware Supreme Court made the following factual findings about what the parties agreed to at the time Petitioner gave his statement:

As mentioned, when we first received [Petitioner's] appeal, we remanded the matter to the trial judge for explicit findings regarding the nature of the agreement made between Petitioner and the State. We posed specific questions which reflected our grave concerns about the relative candor of the parties to the plea negotiations. The trial judge on remand provided answers based on her view of the record.

Concerning the parties explicit or implied limits upon the State's use of [Petitioner's] statement, the trial judge found that the parties had agreed before the proffer that [Petitioner's] statement would be used in two ways: (1) "to determine whether the State would dismiss the charges against Hunter" and (2) "to evaluate the propriety of waiving the death penalty in connection with the prosecution of the 23rd Street double murders." The trial judge focused on the context in which [Petitioner] provided the statement to reach this conclusion: the Lancaster Avenue trial was drawing to a close and an eye-witness for the State had incorrectly

18

identified Hunter as the perpetrator. Under these conditions, [Petitioner] volunteered a statement in order to exonerate his wrongfully charged codefendant. Moreover, [Petitioner] was aware that the trial DAG would be taking his statement to his superiors, and that, if his statement checked out, the State would not seek the death penalty should they charge him in the 23rd Street homicides. Because the State would need to corroborate his statement in order to determine its truth, the trial judge concluded that [Petitioner] should have been, and therefore had to be aware, that the State would not limit its use of his statement to the "senior staff's" consideration of whether to seek the death penalty.

On remand, the trial judge also addressed the trial DAG's comment at the end of [Petitioner's] interrogation that "we're not gonna talk about this with Sticky or Larry Johnson or anybody else." Based upon (i) email correspondence between the trial DAG and Bartley discussing any agreement; (ii) [Petitioner's] December 4, 2003 affidavit in which he fails to assert that the State's use of his statement was in any way limited; (iii) [Petitioner's] knowledge that the State would "check out" his statement in order to determine its veracity; and, (iv) the trial DAG's testimony under oath regarding why he made the comment, the trial judge determined that "the State's interest in not talking to Sticky or Larry Johnson was related to [Petitioner's] personal security." She buttressed her conclusion by noting the context of the trial DAG's comment and [Petitioner's] reaction, "I think Sticky already knows." She rationalized that [Petitioner's] reaction illustrates that [Petitioner] understood that the trial DAG's statement related to avoiding possible retribution from his codefendants and to protecting his personal security, rather than as a limitation on the State's ability to corroborate [Petitioner's] statement. Moreover, the trial judge noted the fact that Petitioner's attorney, Bartley, was present when the trial DAG made this comment and did not seek to clarify the comment—evidence that Bartley did not share [Petitioner's] misunderstanding.

Overall, the trial judge focused on [Petitioner's] understanding that the State needed to verify his statement before it would forgo seeking the death penalty. [Petitioner] understood that his statement needed to be "checked out." The trial judge noted that the very idea of corroboration

belies an agreement to limit use of [Petitioner's] statement. As she put it, "[t]he logical way to corroborate [Petitioner's] statement was to return to the scene of the crime to collect additional evidence, and to confront the other perpetrators of the crime with his statement." In so concluding, the trial judge determined that "the agreement before and after the proffer was that the only limitation on the use of the statement was D.R.E. 410," and that "[t]he State did not breach the deal with [Petitioner]."

Finally, when the trial judge assessed whether [Petitioner] detrimentally relied on any promise by the State to use his statement only for a limited purpose, the trial judge found that "[Petitioner] gave his statement because he felt a 'moral imperative' not to let Hunter be convicted of Lancaster Avenue, or charged with 23rd Street." Implicitly, [Petitioner], the perpetrator of one attempted murder and two actual murders, suddenly found himself driven by "moral imperative," and not by self-interest linked to limiting the State's use of his incriminating statement.

Because the trial judge's factual findings and her credibility determinations are supported by the record, and because it does not appear that she abused her discretion when she reached the conclusions that she did, we, despite serious misgivings after our review of the record, affirm the trial judge's denial of [Petitioner's] motion to suppress evidence derived from his statement. Though we are disturbed by the possibility that the State had been less than candid in its representations to [Petitioner], we cannot conclude that the trial judge's factual findings are clearly erroneous. Finally, we note that [Petitioner] provided his statement against the clear and unequivocal advice of his attorney. We believe the record does support a view that [Petitioner] would have offered his statement even without a promise from the State to limit its use in order to exonerate Hunter.

We respect the minority's thoughtful analysis so well-articulated in their joint dissent. First, we believe the trial judge's finding that [Petitioner] as well as the State understood that [Petitioner's] statement would have to be independently corroborated before the "fives" would consider it in the mix for purposes of waiving the death penalty is supported by the testimony heard live by the trial judge and

by [Petitioner's] own sworn affidavit. We should and do defer to the trial judge's findings based upon her firsthand credibility assessments.

Second, the record evidence does not reflect that the State "promised [Petitioner] that it would not seek the death penalty if [Petitioner] gave his proffered statement and if the statement was independently corroborated." All the DAG professed to do was to bring [Petitioner's] statement to the attention of the "fives" and if it were independently corroborated, the "fives" would consider it among all the other factors that customarily are in the mix in determining whether to seek or waive the death penalty in a murder first degree prosecution. The trial judge so concluded and the record evidence supports that view.

We are compelled to stress that the parties easily could have avoided the confusion caused by the resulting misunderstanding by putting their agreement in writing or on the record before the proffer. To the extent possible, all agreements of this type should be in writing or placed on the record in open court or chambers. Documenting agreements or "deals" in this way will greatly reduce the potential for after the event confusion. More importantly, by spending the limited time necessary to reduce an agreement to writing, parties can obviate the need to hold a hearing to determine whether an agreement exists and its terms, thereby saving several days of the courts' and the parties' time.

*Cole v. State*, 922 A.2d at 371–73.

While repetitive, the Court finds it helpful to summarize the Superior Court's

factual findings on remand as follows:

> 1. Before Petitioner made the proffer, he and the State agreed that it would be used in two ways. "First, they implicitly agreed that the statement would be used to determine whether the State would dismiss the charges against Hunter who was likely to be wrongly convicted." *Cole*, 2006 WL 1134222, at *1. Second, Petitioner and the State "explicitly agreed that the State would use the statement to evaluate the propriety of waiving the death penalty in connection with the prosecution of the 23rd

21

Street double murders. After the statement was taken, the State informed [defense counsel] Bartley that it would have to be 'corroborated.'" *Id.* at *1.

2. With respect to the State's statement at the end of Petitioner's interrogation ("we won't talk about this with anyone else") and its subsequent act of authorizing the police to do the opposite (confront Norton and Johnson with Petitioner's statement), the Superior Court concluded "that the agreement before and after the proffer was that the only limitation on the use of the statement was D.R.E. 410. The State did not breach the deal with [Petitioner]." *Cole*, 2006 WL 1134222, at *2, *5. The Superior Court provided the following reason for this conclusion: "The voluntary nature of the statement, given against the advice of counsel, the corroboration requirement; the explanation of [the State]; the post-statement arrival of the 'investigative purposes' limitation; [Petitioner's] affidavit where he says that he knew the state would check out the statement, and that he would be convicted of the 23rd Street murders; lead me to conclude that the limitation on the use now asserted was not contemplated at the time the proffer was taken." *Cole*, 2006 WL 1134222, at *5.

3. "[Petitioner] gave his statement because he felt a 'moral imperative' not to let Hunter be convicted of Lancaster Avenue, or charged with 23rd Street, and he hoped to escape the death penalty." *Cole*, 2006 WL 1134222, at *6.

4. "No agreement existed that the State would use the proffer for the limited purpose now asserted, *i.e.*, not to talk to the other perpetrators." *Cole*, 2006 WL 1134222, at *6.

After reviewing the record, the Court finds that the Delaware state courts did not unreasonably determine the facts when concluding that the only limitation on the State's use of the proffer was under D.R.E. 410. *See* § 2254(d)(2). In other words, contrary to Petitioner's assertion, Petitioner and the State did not orally agree that the proffer could

not be used for investigative purposes such that it could only be used by the Attorney General's Senior Staff to determine whether to waive the death penalty in the 23rd Street double murder case. The Superior Court's factual determination on remand that the State did not breach any agreement or deal with Petitioner when it used his January 14, 2003 proffer was based on evidence developed at the February 2004 evidentiary hearing on Petitioner's motion to preclude the death penalty. *See Cole*, 2006 WL 1134222, at *1-3, ns.3-6, 13, 16. For instance, during the evidentiary hearing on the motion to preclude the death penalty, the Superior Court found that:

> The transcript contains no promises about benefit to [Petitioner] as a result of the proffer, other than [the trial DAG's] willingness to consider the information and review [Petitioner's] request again with the senior staff. Notwithstanding [Petitioner's] assertions otherwise, it appears that it was not until after the proffer that a misunderstanding developed.

*Cole*, 922 A.2d at 369.

The Superior Court was in the best position to weigh the evidence and make credibility determinations, and the Delaware Supreme Court was entitled to give deference to the Superior Court's factual findings. On habeas review, the state courts' factual findings are presumed to be correct, and Petitioner can only rebut the presumption of correctness with clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). Since the state courts' findings of fact have fair support in the record, and given Petitioner's failure to establish by clear and convincing evidence that the state courts' findings are erroneous, the Court defers to and adopts those factual findings.

23

The next step in the Court's inquiry is to determine if the Delaware Supreme Court's decision affirming the Superior Court's denial of Petitioner's motion to suppress and the admission of evidence obtained through the use of the proffer involved an unreasonable application of clearly established federal law. However, as previously explained, the State contends that Claim One fails to assert an issue cognizable on federal habeas review, because the "Delaware Supreme Court analyzed [Petitioner's] statement under the auspices of state contract law, rather than federal constitutional law." (D.I. 44 at 17-18)

While the Court agrees that the Delaware state courts analyzed the parameters of the proffer/statement under principles of contract law, that does not mean that habeas review is foreclosed. It is well-settled that a "proffer agreement is a contract and its terms must be read to give effect to the parties' intent." *United States v. Hardwick*, 544 F.3d 565, 570 (3d Cir. 2008); *see United States v. Nolan-Cooper*, 155 F.3d 221, 236 (3d Cir. 1998) ("Plea agreements, although arising in the criminal context, are analyzed under contract law standards."). Proffer agreements present issues similar to those presented by plea agreements, and both raise special due process concerns and must be construed accordingly. *See United States v. Baird*, 218 F.3d 221, 229 (3d Cir. 2000); *United States v. Parra*, 302 F.Supp.2d 226, 236 (S.D.N.Y. 2004). Moreover, a liberal construction of Petitioner's argument regarding the admission of evidence obtained from the use of the proffer indicates that he is arguing that the State violated his right to due process by failing to adhere to his understanding of the oral agreement[3]

_____

[3]*See John v. Russo*, 455 F.Supp.2d 1, 7-8 (D. Mass. 2006).

and that the admission of the evidence violated his Fifth Amendment right to be protected from self-incrimination.[4] These two arguments assert constitutional claims and are cognizable on federal habeas review.

The Court acknowledges that Petitioner did not present either of these arguments to the Delaware Supreme Court in any of his state court proceedings, meaning that the arguments are procedurally barred from habeas review. Nevertheless, having accepted as correct the Delaware Supreme Court's factual finding that the parties did not agree to limit the State's investigative use of the proffer, the Court necessarily concludes that the Delaware Supreme Court's affirmance of the denial of the suppression motion did not involve an unreasonable application of clearly established federal law, whether analyzed as a due process issue or a self-incrimination issue.[5]

---

[4]For instance, Petitioner cited to *Kastigar v. United States*, 406 U.S. 441 (1972) in his motion to suppress. *See* (D.I. 45-14 at 41) In *Kastigar v. United States*, 406 U.S. 441 (1972), the Supreme Court confirmed that immunity from use and derivative use is coextensive with the scope of the privilege against self-incrimination, and that "immunity from use and derivative use 'leaves the witness and the Federal Government in substantially the same position as if the witness had claimed his privilege' in the absence of a grant of immunity." *Id.* at 457. *Kastigar* involved an immunity statute and, therefore, is inapplicable to this case. Nevertheless, Petitioner appears to be basing his argument on the underlying principles in *Kastigar*.

[5]Here, Petitioner entered into a contract whereby he agreed that the State could develop information gained from his statement made under the agreement. *See, e.g., United States v. Pielago*, 135 F.3d 703 (11th Cir. 1998). Since the proffer agreement between Petitioner and the State did not prevent the State from using the proffer to gain information from Petitioner's accomplices, the Superior Court's denial of Petitioner's motion to suppress did not violate his rights under the Due Process Clause or the Fifth Amendment.

## B. Claim Two: Admission of Bessie Warner's Out-Of-Court Statement Through Detective Chaffin's Testimony

In Claim Two, Petitioner contends that the State violated his rights under the Confrontation Clause when it proffered the out-of-court statement of Bessie Warner through the testimony of Detective Chaffin. His specific argument is as follows:

> The state offered into evidence a statement allegedly made by Bessie Warner to Detective Chaffin. Said statement was purportedly audiotaped, however, the tape was not audible. Bessie Warner testified she could not remember what she said in that statement. The State offered Detective Chaffin's testimony of his recollection of the statement over objection of the defense. The defense was not able to confront this evidence because the tape was poorly made and because Ms. Warner, who allegedly made the statement, could not recall the statement. Ms. Warner on *voir dire* and consistently through the cross-examination denied any knowledge of any out-of-court statements to Detective Chaffin. The trial judge ruled that the out-of-court statement had sufficient indicia of reliability to be admitted. The court then allowed Detective Chaffin to tell the jury what he heard. Clearly, [Petitioner] could not confront Bessie Warner as she repeatedly denied having any knowledge of the statements. The issue is not whether Detective Chaffin could testify as to hearsay but whether [Petitioner] could effectively confront the person who made the statement. "Not only should the evidence be reliable, but that reliability be assessed in a particular manner: by testing it in the crucible of cross-examination." It was an error of law to allow Detective Chaffin to testify about Ms. Warner's out-of-court statement. Since she could not recall the statement she was not subject to cross-examination and Detective Chaffin's testimony should have been excluded.

(D.I. 2 at 8)

Petitioner and his co-defendant Johnson presented the same Confrontation Clause argument to the Delaware Supreme Court in their direct appeals, but because of the remand in Petitioner's case, the Delaware Supreme Court decided Johnson's

26

appeal first, holding Johnson's rights under the Confrontation Clause were not violated

by the use of Bessie Warner's out-of-court statement. *See Johnson v. State*, 878 A.2d

422, 427-29 (Del. 2005). When the Delaware Supreme Court reached the same issue

in Petitioner's appeal after remand, it held that "*stare decisis* compels is to rule

consistently [in Petitioner's appeal]. As a result, [Petitioner's] confrontation claim fails."

*Cole*, 922 A.2d at 374. Given this adjudication, Petitioner will only be entitled to habeas

relief if the Delaware Supreme Court's denial of Claim Two was either contrary to, or

involved an unreasonable application of, clearly established federal law.

Since the Delaware Supreme Court relied on *stare decisis* in Petitioner's appeal,

the Court will begin its analysis with the Delaware Supreme Court's decision in

Petitioner's co-defendant's (Johnson) case. On direct appeal of Johnson's conviction,

the Delaware Supreme Court described the facts surrounding the Confrontation Clause

argument as follows:

> In prosecuting both Johnson and [Petitioner], the State
> introduced evidence of the burglaries at 1348 Lancaster
> Avenue and 105 East 23rd Street. The State also introduced
> [Petitioner's] guilty plea to the burglary at 1348 Lancaster
> Avenue and ballistics evidence that the two guns were the
> same used in each incident. Johnson testified in his own
> defense and denied any involvement in both incidents.
> Johnson's counsel also presented the testimony of a victim
> from the 1348 Lancaster Avenue incident who positively
> identified Elwood Hunter as a perpetrator and who was
> unable to identify Johnson as one of the perpetrators.
>
> The State then presented Bessie Warner ("Warner") as a
> reluctant rebuttal witness to Johnson's defense. Warner was
> [Petitioner's] girlfriend and the two had a child together. On
> direct examination, Warner testified that she overheard a
> conversation between Johnson and [Petitioner] in the
> summer of 2001 regarding a burglary and a shooting.

27

However, she claimed that she could not recall the details of this conversation. Warner also claimed that she could not recall speaking with Detective Scott Chaffin ("Detective Chaffin") of the Wilmington Police Department about the conversation she overheard.

After Warner explained her lack of recollection, the State presented her prior out-of-court statement through Detective Chaffin. Detective Chaffin testified that he had two earlier conversations with Warner on October 9 and 10, 2001 and during the second visit he learned that Warner had received an appraisal of a ring allegedly taken from 1348 Lancaster Avenue. Detective Chaffin obtained the appraisal form and receipt. According to Detective Chaffin, Warner told him that Johnson gave the ring to Cole and two days later [Petitioner] gave the ring to her to have it appraised. Although this ring was never recovered, Warner told Detective Chaffin that she returned the ring to [Petitioner] after she obtained the appraisal.

Detective Chaffin also testified that he, along with another detective from the Wilmington Police Department, met with Warner again on December 19, 2001. During this meeting, Warner described how she recalled overhearing a conversation between Johnson and [Petitioner] talking outside her house in which they discussed a burglary and shooting. Warner also told Detective Chaffin that it was during this conversation that Johnson gave the ring to [Petitioner]. When [Petitioner] came back into the house, Warner told Detective Chaffin that she observed [Petitioner] in possession of a ring. It was two days later when [Petitioner] asked Warner to have the ring appraised.

*Johnson*, 878 A.2d at 427.

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. The Supreme Court has held that the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had ... a prior

opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004).

However, the Confrontation Clause guarantees only "an **opportunity** for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (emphasis in original); *United States v. Owens*, 484 U.S. 554, 559 (1988).

Consequently, as long as "the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." *Crawford*, 541 U.S. at 59 n. 9; *see California v. Green*, 399 U.S. 149, 158 (1970) (holding that the Confrontation Clause "is not violated by admitting a declarant's out-of-court statements, as long as the declarant is testifying as a witness and subject to full and effective cross-examination"). Even when a witness gives "testimony that is marred by forgetfulness, confusion or evasion," the Confrontation Clause is generally satisfied so long as the defense "is given a full and fair opportunity to probe and expose these infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony." *Fensterer*, 474 U.S. at 22. Significantly, while both the Supreme Court and the Third Circuit have held that the Confrontation Clause is violated when a witness refuses to testify on privilege grounds,[6] neither have recognized memory loss or feigned memory loss as cognizable bases for a valid Confrontation Clause claim. *See Owens*, 484 U.S. at 564

---

[6]*See Douglas v. Alabama*, 380 U.S. 415, 422 (1965); *Preston v. Superintendent Graterford SCI*, 902 F.3d 365 (3d Cir. 2018) (holding that the use of a witness's prior statement against a criminal defendant violates the defendant's Confrontation Clause rights when the witness invokes his Fifth Amendment privilege and refuses to answer any substantive questions on cross-examination because such a witness has not been made available for meaningful cross-examination).

(Confrontation Clause not violated by the admission of an identification statement from a witness who is unable, because of memory loss, to testify regarding the identification); *United States v. Cuyler*, 548 F.2d 460, 463 (3d Cir. 1977) (explaining that if a witness "has been sworn and made available[,] the fact that he suffers or feigns a loss of memory does not lessen the fact that the defendant has been confronted with him and presented with the opportunity to cross-examine him to the extent possible, which is all that the Sixth Amendment requires."); *see also Binns v. McDonald*, 2017 WL 3534988, at \*6 (C.D. Cal. Apr. 5, 2017) (collecting cases which note that the Supreme Court has not addressed the issue of feigned memory loss).

In Johnson's appeal, the Delaware Supreme Court addressed the Confrontation Clause argument under *Crawford*, ruling that:

> The Sixth Amendment of the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him ...." This fundamental right is made obligatory on the States by virtue of the Fourteenth Amendment. "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact."
>
> Until the United States Supreme Court decided *Crawford*, the scope of a defendant's confrontation rights was conditioned on whether the hearsay evidence fell within a firmly rooted hearsay exception or bore a particularized guarantee of trustworthiness. *Crawford* rejected this general framework with respect to prior testimonial statements, holding that under the Sixth Amendment, out-of-court testimonial statements by witnesses are inadmissible against the defendant if the witness is unavailable and there is no opportunity to cross-examine the witness. Johnson contends that, in light of *Crawford*, his confrontation rights were violated by admitting Warner's prior out-of-court statement.

He maintains that although Warner testified, she was nonetheless not subject to cross-examination because she repeatedly denied having knowledge of the statements she previously made to Detective Chaffin. We find that Johnson's reliance on *Crawford* is misplaced and his constitutional challenge unpersuasive.

*Crawford* did "not expressly require any specific quality of cross-examination...." The Confrontation Clause only guarantees a defendant the opportunity for effective cross-examination of the declarant, not effective cross-examination in whatever way and in whatever manner a defendant may wish. Thus, when a witness takes the stand at trial, and is subject to cross-examination, the traditional protections afforded under the Confrontation Clause are satisfied.

In this case, Warner took the stand and was subject to cross-examination. Defense counsel had the opportunity to cross-examine Warner about her recollection of the overheard conversation between Johnson and [Petitioner] and her prior discussions with Detective Chaffin. The mere fact that Warner's recollection was limited does not make her unavailable for cross-examination for Confrontation Clause purposes. We therefore conclude that there was no denial of Johnson's confrontation rights.

*Johnson*, 878 A.2d at 428–29 (citations omitted).

The Delaware Supreme Court relied on *stare decisis* and applied its ruling from

Johnson's case to hold that Petitioner's Confrontation Clause rights were not violated by

the admission of Ms. Warner's out-of-court statement. That holding is neither contrary

to, nor an unreasonable application of, clearly established law regarding the

Confrontation Clause. In Petitioner's case, Ms. Warner appeared at trial, was examined

by the State, and was subject to cross-examination by defense counsel about her

recollection of the overheard conversation between Johnson and Petitioner and her

prior discussions with Detective Chaffin. Even if Ms. Warner was being evasive when

she testified that she did not recall the contents of the conversation or that she did not recall telling Detective Chaffin about the conversation, she nevertheless was available to the defense for cross-examination. The jury was able to evaluate her demeanor and credibility as to both her trial testimony and her prior inconsistent statement. In short, despite Ms. Warner's memory loss, the defense had "a full and fair opportunity to probe and expose these infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony." *Fensterer*, 474 U.S. at 22. Accordingly, the Court concludes that the Delaware Supreme Court did not unreasonably apply *Crawford* and its progeny in holding that the admission of Ms. Warner's statements did not violate Petitioner's rights under the Confrontation Clause.

### C. Claim Three: Admission of Window Screen

In Claim Three, Petitioner contends that the trial court erred by refusing to suppress evidence of a window screen recovered from the scene of the murders eighteen months after the crimes were committed. Petitioner presented this Claim to the Delaware Supreme Court in his direct appeal, arguing that the admission of this evidence violated Delaware Rule of Evidence ("D.R.E.") 901. The Delaware Supreme Court analyzed the Claim under D.R.E. 901 and affirmed the trial court's decision, holding that because "the State provided a rational basis from which the jury could conclude that [the screen] was connected to [Petitioner]," it was not error to admit it at trial. *Cole*, 922 A.2d at 374-75.

Claims alleging errors in state evidentiary rulings are only reviewable in habeas

corpus proceedings if the evidentiary rulings rise to the level of a due process violation.

*See Estelle v. McGuire*, 502 U.S. 62, 67-8 (1991). A petitioner establishes a due

process violation by showing that the evidentiary error was so pervasive that he was

denied a fundamentally fair trial. *See Biscaccia v. Attorney General of Sate of N.J*, 623

F.2d 307, 312 (3d Cir. 1980).

In his Petition, Petitioner presented Claim Three purely as a state evidentiary

issue, thereby failing to assert an issue cognizable on federal habeas review. Petitioner

attempts to correct this "failure" in his Reply to the State's Answer by asserting that the

State's failure to lay a proper foundation for the evidence violated his federal due

process rights. This attempt to present a facially cognizable habeas claim by alleging a

federal constitutional claim is unavailing. Although it is not necessary for a petitioner to

cite the federal constitution "book and verse" in order to "fairly present" a federal claim

to a state court, it is well-settled that a habeas petitioner who "wishes to claim that an

evidentiary ruling at a state court trial denied him the due process of law guaranteed by

the Fourteenth Amendment [] must say so." *Duncan v. Henry*, 513 U.S. 364, 366

(1995) (holding that a claim of "miscarriage of justice" does not qualify as a federal

constitutional claim"). The Third Circuit Court of Appeals has clarified this rule,

specifically holding that

> [a petitioner does] not invoke the federal due process
> guarantee [by claiming that] the admission of the evidence
> produced a "miscarriage of justice" [or] argu[ing] that the
> [trial process] denied him a "fair trial." Since the Supreme
> Court found the former language insufficient to give fair
> notice of a federal due process claim, we are hesitant to

33

> attach greater significance to the passing reference to the
> concept of a "fair trial" on which [the petitioner's] argument
> rests.

*Keller v. Larkins*, 251 F.3d 408, 413-15 (3d Cir. 2001). Rather, a federal legal claim is

"fairly presented" to state courts when there is: (1) reliance in the state courts on

pertinent federal cases employing constitutional analysis; (2) reliance on state cases

employing constitutional analysis in like fact situations; (3) assertion of the claim in

terms so particular as to call to mind a specific right protected by the Constitution; and

(4) an allegation of a pattern of facts that is well within the mainstream of constitutional

litigation. *McCandless v. Vaughn*, 172 F.3d 255, 261 (3d Cir. 1999).

After viewing Petitioner's presentation of Claim Three to the Delaware Supreme

Court on direct appeal within the framework provided by the aforementioned precedent,

the Court concludes that Petitioner's appellate argument regarding D.R.E. 901 does not

satisfy the "fair presentation" component of the exhaustion doctrine. On direct appeal,

Petitioner argued that the trial court abused its discretion to allow the screen into

evidence because there was a lapse of eighteen months between the crime and

discovery of the screen. *See Cole v. State*, 2005 WL 1923062, at *16 (Del. App. Br.).

He specifically asserted that "[t]he state's failure to authenticate the object and establish

the chain of custody should have rendered the evidence inadmissible." *Cole*, 2005 WL

1923062, at *14. The state cases cited in the appellate brief do not employ any federal

due process analysis. Additionally, the appellate brief's "abuse of discretion" argument

does not bring due process concerns to mind or allege "a pattern of facts that is well

within the mainstream of constitutional litigation." For these reasons, the Court will deny

Claim Three because Petitioner presented the claim to the Delaware Supreme Court in terms of a state evidentiary error rather than as a violation of a constitutional right.

### D. Claims Four and Five: Ineffective Assistance of Counsel And Felony Murder

In Claims Four and Five, Petitioner contends that his attorneys provided ineffective assistance at trial and on appeal by failing to argue that the murders he committed were not "in furtherance of" the burglary and, therefore, the jury could not find him guilty of felony murder. Petitioner presented this argument to the Delaware Supreme Court on postconviction appeal of his first Rule 61 motion, and the Delaware Supreme Court denied it as meritless. Given this adjudication, Claims Four and Five will only warrant relief if the Delaware Supreme Court's decision was either contrary to, or an unreasonable application of, clearly established federal law.

The clearly established Supreme Court precedent governing ineffective assistance of counsel claims is the two-pronged standard enunciated by *Strickland v. Washington*, 466 U.S. 668 (1984) and its progeny. *See Wiggins v. Smith*, 539 U.S. 510 (2003). Claims of ineffective assistance of appellate counsel are evaluated under the same *Strickland* standard applicable to trial counsel. *See Lewis v. Johnson*, 359 F.3d 646, 656 (3d Cir. 2004). Under the first *Strickland* prong, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness," with reasonableness being judged under professional norms prevailing at the time counsel rendered assistance. *See Strickland*, 466 U.S. at 688. Under the second *Strickland* prong, a petitioner must demonstrate "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

35

*Id.* at 694. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Id.*

Finally, in order to sustain an ineffective assistance of counsel claim, a petitioner must make concrete allegations of actual prejudice and substantiate them or risk summary dismissal. *See Wells v. Petsock*, 941 F.2d 253, 259-60 (3d Cir. 1991); *Dooley v. Petsock*, 816 F.2d 885, 891-92 (3d Cir. 1987). Although not insurmountable, the *Strickland* standard is highly demanding and leads to a strong presumption that the representation was professionally reasonable. *See Strickland*, 466 U.S. at 689.

Turning to the first prong of the § 2254(d)(1) inquiry, the Court notes that the Superior Court correctly identified the *Strickland* standard applicable to Petitioner's ineffective assistance of counsel allegations. Consequently, the Superior Court's decision was not contrary to clearly established federal law. *See Williams*, 529 U.S. at 406 ("[A] run-of-the-mill state-court decision applying the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case [does] not fit comfortably within § 2254(d)(1)'s 'contrary to' clause").

The Court's inquiry is not over, however, because it must also determine if the Superior Court reasonably applied the *Strickland* standard to the facts of Petitioner's case. When performing this inquiry, the Court must review the Superior Court's decision with respect to Petitioner's ineffective assistance of counsel claims through a "doubly deferential" lens.[7] *Richter*, 562 U.S. at 105. Notably, when § 2254(d) applies,

---

[7]As explained by the *Richter* Court,

> [t]he standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is doubly so. The *Strickland* standard is a general one, so the range of reasonable

36

"the question is not whether counsel's actions were reasonable, [but rather], whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* When assessing prejudice under *Strickland*, the question is "whether it is reasonably likely the result would have been different" but for counsel's performance, and the "likelihood of a different result must be substantial, not just conceivable." *Id.* And finally, when viewing a state court's determination that a *Strickland* claim lacks merit through the lens of § 2254(d), federal habeas relief is precluded "so long as fairminded jurists could disagree on the correctness of the state court's decision." *Id.* at 101.

In his post-conviction appeal of his first Rule 61 motion, Petitioner argued that defense counsel provided ineffective assistance by failing to argue that the evidence was insufficient at trial to establish the crime of burglary and, consequently, the crime of first degree felony murder, because the evidence at trial did not prove that he broke into the victims' home with the intent to steal money and drugs from them. Instead, Petitioner argued that "evidence at trial established that he broke into the victims' home with the sole intent to murder them." *Cole*, 2008 WL 1887292, at*1. The Delaware Supreme Court rejected this argument after determining that the "record at trial clearly established that [Petitioner] and his codefendants broke into the victims' home with the intent to steal money and drugs." *Cole v. State*, 947 A.2d 1120 (Table), 2008 WL 1887292, at *1 (Del. 2008). The Delaware Supreme Court explained that

applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).
*Richter*, 562 U.S. at 105 (internal citations omitted).

[o]ne of [Petitioner's] coconspirators, Travanian Norton, testified against [Petitioner] at trial and stated that [Petitioner] and his codefendant, Larry Johnson, chose the victims' home because they believed that a drug dealer lived there and that the house would have both drugs and money. The drug dealer, however, had moved. When the three intruders broke into the home, the victims were awakened by their sons' shouting. The evidence at trial established that [Petitioner] was the primary shooter, firing six times, killing both victims. Based on this evidence, the jury acquitted [Petitioner] of first degree intentional murder, instead finding him guilty of two counts of second degree murder, and two counts of felony murder, as well as the related charges.

*Cole v. State*, 947 A.2d 1120 (Table), 2008 WL 1887292, at *1 (Del. 2008). The Delaware Supreme Court further opined that "the outcome of the case would have been much worse for [Petitioner] [if defense counsel had argued to the jury that Petitioner's sole intent in breaking into the home was to commit murder] because the jury would have convicted him of the more serious crimes of first degree intentional murder. Under the circumstances, defense counsel's strategy clearly was reasonable and resulted in the jury's acquittal of [Petitioner] on the intentional murder charges." *Id.* at 2.

After considering the record, and viewing the Delaware Supreme Court's decision through the doubly deferential lens applicable on habeas review, the Court concludes that the Delaware Supreme Court reasonably applied *Strickland* in concluding that defense counsel did not render ineffective assistance. In short, if defense counsel had argued that Petitioner entered the home to commit multiple acts of murder, it is very probable that he would have been convicted of first degree intentional murder rather than acquitted of those charges. Accordingly, the Court will deny this allegation of Claims Four and Five for failing to satisfy § 2254(d).

Petitioner, however, also argues that the trial judge gave an erroneous jury instruction on the felony murder charges and that defense counsel were ineffective for failing to object to the instructions. Petitioner did not present either of these arguments to the Delaware Supreme Court on direct appeal or on post-conviction appeal. At this juncture, any attempt by Petitioner to raise these allegations in a new Rule 61 motion would be barred as untimely under Delaware Superior Court Criminal Rule 61(i)(1) and as procedurally defaulted under Rule 61(i)(3). *See* Del. Super. Ct. Crim. R. 61(i)(1), (3). As a result, the Court must treat the arguments as technically exhausted but procedurally defaulted, which means that the Court cannot review the merits of the arguments absent a showing of cause and prejudice, or that a miscarriage of justice will result absent such review.

Petitioner does not assert, and the Court cannot discern, any cause for his procedural default. Given Petitioner's failure to establish cause, the Court will not address the issue of prejudice. The miscarriage of justice exception to the procedural default doctrine also does not excuse Petitioner's default, because he has not alleged any facts or provided new reliable evidence to establish his actual innocence. Accordingly, the Court will deny Petitioner's argument regarding the felony murder instruction and defense counsel's failure to object to the instruction as procedurally barred from habeas review.[8]

---

[8]The Court also concurs with the State's additional reason for denying the jury instruction argument as non-cognizable and meritless. (*See* D.I. 44 at 27-29)

### E. Claim Six: Trial Court Bias

In Claim Six, Petitioner contends that his due process rights were violated due to judicial bias. According to Petitioner, the bias stemmed from the fact that one of the prosecutors had worked as the judge's law clerk years earlier. It appears that Petitioner did not raise an independent judicial bias claim in his state post-conviction proceedings. However, in his second Rule 61 motion, he alleged that defense counsel provided ineffective assistance because they did not tell him that one of the prosecutors had been the trial judge's law clerk "years before the [motion to preclude death penalty] hearing." (D.I. 45-20 at 18) Petitioner also contended that "it [was] likely that they had a very close relationship" that "could have impacted the credibility determinations made in this case that went against [Petitioner]." *Id.* Defense counsel responded that "[a]t the time of this case [the prosecutor] had been in practice for approximately 10 years and one can only speculate as to the [trial judge's] opinion of him." (D.I. 45-6 at 48)

The Delaware Superior Commissioner rejected Petitioner's argument, explaining:

> There is nothing in the record that shows Counsel was aware of the relationship until after the determination of the motion, nothing to indicate the judge and her former law clerk developed a close relationship while [the prosecutor] worked for her, there is nothing to indicate the judge maintained a close relationship with [the prosecutor], nor is there anything in the record which puts the judge's decision making process in question.
>
> *Strickland* requires more than innuendo. Moreover, even if Counsel should have informed [Petitioner] of this information during trial or after, depending on when Counsel was aware of it, there is still no indication that the judge would have, indeed, recused herself. Hence, [Petitioner] cannot show actual prejudice.

40

(D.I. 45-9 at 29-30)

The record reveals that Petitioner did not present this issue to the Delaware Supreme Court on post-conviction appeal. Consequently, Petitioner did not exhaust state remedies for Claim Six.

At this juncture, any attempt on Petitioner's part to re-assert this claim in a new Rule 61 motion would be time-barred under Rule 61(i)(1) and barred as a second or successive post-conviction motion under Rule 61(i)(2). Therefore, the Court must treat the Claim as technically exhausted but procedurally barred. Petitioner does not assert any cause or prejudice that will result if the Court does not review the Claim, and he does not allege that a miscarriage of justice will result if the Court does not review the Claim. For all of these reasons, the Court will deny Claim Six as procedurally barred from federal habeas review.

### F. Claim Seven: Ineffective Assistance of Counsel

In Claim Seven, Petitioner contends that defense counsel provided ineffective assistance by failing to visit/communicate with him enough, interview other possible suspects, and visit the crime scene. Petitioner also contends that the Court should apply *United States v. Cronic* and presume that he was prejudiced by the aforementioned "errors" of counsel.

Petitioner presented Claim Seven to the Superior Court in his second Rule 61 motion. The Superior Court held that *Cronic* was inapplicable to Petitioner's case, and that Petitioner would have to show *Strickland* prejudice in order to obtain relief. (D.I. 45-12 at 11-13) However, the Superior Court then concluded that Petitioner's allegations

41

that counsel did not visit/communicate with him enough, interview other possible suspects, and visit the crime scene were procedurally barred under Rules 61(i)(1) as untimely and under Rule 61(i)(2) because they were not presented in Petitioner's first Rule 61 motion. (D.I. 45-12 at 15-16) After noting that Petitioner could escape the procedural bars of Rule 61(i)(1) and (2) by establishing a colorable claim of a miscarriage of justice pursuant to Rule 61(i)(5), the Superior Court proceeded to analyze whether Petitioner's arguments satisfied Rule 61(i)(5). (D.I. 45-12 at 16)

With respect to counsel's failure to visit/communicate and interview other possible suspects, the Superior Court concluded that Petitioner could not avoid the procedural bars by establishing a colorable claim of a miscarriage of justice under Rule 61(i)(5) because he failed to establish concrete prejudice. (D.I. 45-12 at 23, 33) On post-conviction appeal, the Delaware Supreme Court also found that Petitioner did not satisfy Rule 61(i)(5) because he did not demonstrate prejudice stemming from these errors. Thus, the Delaware Supreme Court denied the instant allegation as procedurally barred.

With respect to counsel's failure to visit the crime scene, the Superior Court concluded that Petitioner met the requirements of Rule 61(i)(5) by showing a colorable constitutional violation. Specifically, the Superior Court found that trial counsel's "failure to visit the scene was less than what a reasonable attorney would do." (D.I. 45-12 at 35); *Cole*, 2018 WL 1129109, at *6. Although the Superior Court noted that "[a]ssuming the truth of [Petitioner's] contentions he has alleged at least a colorable claim of prejudice," the Superior Court ultimately concluded that the evidence developed at trial

and at the post-conviction evidentiary hearings did not support his contentions. (D.I. 45-12 at 35) Consequently, the Superior Court denied as meritless Petitioner's argument that defense counsel provided ineffective assistance by failing to visit the crime scene. The Delaware Supreme Court affirmed that decision on post-conviction appeal because Petitioner did not establish the requisite prejudice under *Strickland*. *See Cole*, 2018 WL 1129109, at *6.

As for Petitioner's contention that defense counsel did not interview other witnesses or possible suspects, it appears that his Rule 61 motion identified certain individuals he believed counsel should have interviewed. The Superior Court dismissed Petitioner's allegation about failing to interview some of the named potential witnesses as procedurally barred because he failed to establish prejudice sufficient to satisfy Rule 61(i)(5). (D.I. 45-12) The other witnesses Petitioner believed counsel should have interviewed consisted of possible suspects. The Superior Court denied Petitioner's complaint about defense counsel's failure to interview these individuals as meritless, because counsel "knew from [Petitioner's] proffer that their client was the killer." (D.I. 45-13 at 29-34) After explaining that lawyers are ethically prohibited from introducing false evidence, the Superior Court held that defense counsel were fully justified in not pursuing most of the individuals identified by Petitioner. (D.I. 45-12 at 33) The Superior Court also held that Petitioner failed to establish prejudice, because he only alleged vague, conclusory, or speculative claims as to what evidence could have been produced by interviewing the potential suspects. (D.I. 45-12 at 33) On post-conviction appeal, Petitioner limited his complaint about counsel's failure to investigate others,

asserting that they were ineffective for failing to investigate witness Gary Lloyd, who told the police that his cellmate had confessed to the crime. Therefore, the Delaware Supreme Court limited its review to this particular allegation, and also found that Petitioner's contention failed to "meet the requirements of Rule 61(i)(5)." *Cole*, 2018 WL 1129109, at *6. Thus, the Delaware Supreme Court denied the argument as procedurally barred.

In this proceeding, Petitioner contends that the Delaware Supreme Court unreasonably applied federal law because it reviewed Petitioner's allegations of ineffective assistance contained in Claim Seven under the *Strickland* standard rather than under the presumed-prejudice rule of *Cronic*. (D.I. 50 at 5) Petitioner also asserts that the Delaware Supreme Court unreasonably applied *Strickland* by holding that he failed to demonstrate prejudice, because his "trial attorneys did the bare minimum, and [he] was found guilty of lesser offenses." (D.I. 50 at 5) For the following reasons, Petitioner's arguments are unavailing.

### 1. *Cronic* does not apply to Petitioner's case

In *United States v. Cronic,* the United States Supreme Court articulated a very limited exception to *Strickland*'s requirement that a petitioner must demonstrate both deficient performance and prejudice in order to prevail on an ineffective assistance of counsel claim, holding that there are three situations in which prejudice caused by an attorney's performance will be presumed: (1) where the defendant is completely denied counsel at a critical stage; (2) where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing"; or (3) where the circumstances are such that

there is an extremely small likelihood that even a competent attorney could provide effective assistance, such as when the opportunity for cross-examination has been eliminated. *Cronic*, 466 U.S. at 659 & n.25. The accused bears the burden of proving that counsel entirely failed to subject the State's case to a meaningful adversarial process. *Id.* at 659. Significantly, the *Cronic* presumption of prejudice only applies when counsel has completely failed to test the prosecution's case throughout the entire proceeding. *See Bell v. Cone*, 535 U.S. 685, 697 (2002).

Here, the Superior Court properly held that *Cronic* was inapplicable to facts of Petitioner's case, and the Delaware Supreme Court properly refrained from applying *Cronic* on post-conviction appeal, because Petitioner failed to demonstrate a complete absence of representation. For instance, as the Superior Court determined, the record shows that defense counsel "filed pretrial motions, participated in jury selection, presented opening statements, cross-examined the State's witnesses, presented witnesses on his behalf and made closing argument." (D.I. 45-12 at 12) Moreover, in their Rule 61 affidavits to the Superior Court, trial counsel affirmed that they fully discussed Petitioner's case with him many times, even beyond the time reflected in their billing statements, and additionally engaged the services of a professional investigator and mitigation team. (D.I. 45-6 at 39, 41-49, 51-54; D.I. 45-14 at 39-54) For these reasons, the Court concludes that the Delaware Supreme Court did not unreasonably apply clearly established law by concluding that the allegations presented in Claim Seven should be reviewed under *Strickland* rather than *Cronic*.

## 2. Counsel's failure to communicate and interview witnesses

In this proceeding, Petitioner contends that counsel were ineffective because they never visited him and only interviewed one suspect (Benjamin Council). (D.I. 50 at 4) The Delaware Supreme Court denied these allegations as procedurally barred by Rule 61(i)(1) and (2). Petitioner has not provided any cause for his default of these claims and, as a result, the Court will not address the issue of prejudice. Petitioner also has not satisfied the miscarriage of justice exception to the procedural default doctrine because he has not provided new reliable evidence of his actual innocence. Accordingly, the Court will deny these allegations as procedurally barred from federal habeas review.[9]

## 3. Counsel's failure to visit the crime scene

Petitioner contends that defense counsel "never even visited the crime scene," and asserts that, if they had, they would have seen "how poor the lighting was, how tall the fences were, where the bushes were located, and how difficult or near impossible it would've been to gain access to the roof the way Norton testified." (D.I. 50 at 5) The Delaware Supreme Court held that counsel's failure to visit the crime scene did not amount to constitutionally ineffective assistance because

> counsel thoroughly cross-examined a state witness about the lighting at the scene, there was a low fence Norton easily could have seen over, and [Petitioner's] counsel told the jury

---

[9]Exercising an extreme level of prudence, even if the Delaware Supreme Court's discussion of Rule 61(i)(5) with respect to the allegation regarding counsel's failure to interview other suspects amounted to an adjudication on the merits, the Delaware Supreme Court reasonably applied *Strickland* in concluding that Petitioner failed to demonstrate prejudice from the alleged failure. As both Delaware state courts noted, since Petitioner "admitted to the crime," Petitioner could not satisfy either prong of the *Strickland* standard. *See* (D.I. 45-12 at 29-33); *Cole*, 2018 WL 1129109, at *6.

> that climbing onto the roof was 'very difficult' if not
> 'impossible.'

*Cole*, 2018 WL 1129109, at *6. The Delaware Supreme Court's findings of fact are

supported by the record. Petitioner does not provide any other reason creating a

reasonable probability that the result of his trial would have been different but for

counsel's failure to visit the crime. Given these circumstances, the Court concludes that

Petitioner's instant complaint about counsel's performance does not warrant relief under

§ 2254(d).

### G. Claim Eight: Cumulative Error

In his final Claim, Petitioner contends that the Court should find that the

cumulative impact of Claims One through Seven deprived him of a fair trial. This

argument is unavailing. The cumulative error doctrine "allows a petitioner to present a

stand-alone [constitutional] claim asserting the cumulative effect of errors at trial that so

undermined the verdict as to constitute a denial of his constitutional right to due

process." *Collins v. Sec'y of Pa. Dep't of Corr.* 742 F.3d 528, 542 (3d Cir. 2014). If a

court finds no merit in claims of individual errors, however, there is no basis for habeas

relief for "an alleged accumulation of errors that did not exist." *Stewart v. United States*,

2014 WL 3573395, at *11 (D.N.J. July 21, 2014). In addition, a "cumulative error

argument constitutes a stand-alone constitutional claim subject to exhaustion and

procedural default." *See Collins v. Sec'y of Pennsylvania Dep't of Corr.*, 742 F.3d 528,

541 (3d Cir. 2014).

In this case, Petitioner defaulted his cumulative error claim because he did not

present this argument as a stand-alone claim in his Rule 61 proceeding, and the time to

47

present this claim in the Delaware state courts has passed. Petitioner has not asserted any cause or prejudice excusing his default, and the miscarriage of justice exception is inapplicable because he has not asserted his actual innocence. In turn, given the Court's conclusion that none of Petitioner's Claims have merit, there are no errors to aggregate, meaning that Petitioner cannot demonstrate prejudice. Thus, the Court will deny Petitioner's cumulative error claim as procedurally barred from habeas review and, alternatively, as meritless.

## IV.   CERTIFICATE OF APPEALABILITY

The Court must decide whether to issue a certificate of appealabilty. *See* 3d Cir. L.A.R. 22.2 (2011). A certificate of appealability may be issued only when a [Petitioner] makes a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This showing is satisfied when the [Petitioner] demonstrates "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

For the reasons stated above, the Court concludes that the Petition must be denied. Reasonable jurists would not find this Court's assessment of [Petitioner]'s constitutional claims to be debatable or wrong. Consequently, [Petitioner] has failed to make a substantial showing of the denial of a constitutional right, and a certificate of appealability will not be issued.

## V.   CONCLUSION

For the foregoing reasons, the Court will deny the instant Petition. An appropriate Order will be entered.